# Exhibit 8

PAULA WATKINS                                              July 28, 2016
WATKINS vs WELLS FARGO BANK                                         1–4

Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF NEW JERSEY
 2
        NO. 15-cv-05712(JEI)(KMW)
 3
 4
        JAMES WATKINS,
 5
        Plaintiff,
 6
 7           vs
 8
 9      WELLS FARGO BANK, N.A.,
10      Defendant.
        ----------------------------------------
11              DEPOSITION OF
                PAULA WATKINS
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1           TRANSCRIPT of the Deposition of the
 2   witness, called for Oral Examination in the
 3   above-captioned matter, said Deposition being
 4   taken pursuant to Superior Court Rules of
 5   Practice and Procedure by and before LISA ANNA
 6   RINALDI, RPR, a Notary Public and Certified Court
 7   Reporter of the State of New Jersey, at the Law
 8   Offices of FLITTER MILZ, P.C., 525 Route 73
 9   South, Suite 200, Marlton, New Jersey, on
10   Thursday, July 28, 2016, commencing at
11   approximately 1:05 in the afternoon.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   A P P E A R A N C E S:
 2
 3
     FLITTER MILZ, P.C.
 4   Attorneys for the Plaintiff
     525 Route 73 South
 5   Suite 200
     Marlton, New Jersey 08053
 6   BY:  ANDREW M. MILZ, ESQUIRE
     amilz@consumerslaw.com
 7
 8
 9
     REED SMITH, LLP
10   Attorneys for the Defendant
     Princeton Forrestal Village
11   136 Main Street
     Suite 250
12   Princeton, New Jersey  08543
     BY:  KELLIE A. LAVERY, ESQUIRE
13   klavery@reedsmith.com
14
15
16
17
     A L S O    P R E S E N T:
18
     James Watkins
19
20
21
22
23
24
25
```

Page 4

```
 1                I N D E X
 2   WITNESS                              PAGE
     PAULA WATKINS
 3
       By:  Ms. Lavery                      6
 4
       By:  Mr. Milz                       59
 5
 6
 7
 8
              E X H I B I T S
 9
     EXHIBIT NO.    DESCRIPTION       PAGE NO.
10
              (None marked.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



800.211.DEPO (3376)
EsquireSolutions.com

Page 21

1 AT&T when the line was added to your account?
2   A.   I don't recall.
3   Q.   Do you know what Mr. Watkins'
4 cell phone number is?
5   A.   (609)332-0368.
6   Q.   And how is the AT&T account billed?
7 Do you get monthly statements?
8   A.   Yes.
9   Q.   And do you have any sort of plan with
10 AT&T, like a prearrangement of what your monthly
11 bill will be with certain minutes allotted or
12 allowed?
13  A.   I think so.
14  Q.   Do you know how that works?
15  A.   Not really, cause the language is so
16 crazy. It's hard to say. So I know what the
17 bill should be monthly. I don't know a lot
18 about the details, about, you know, what kind of
19 plan. I'm just not into the plan and the
20 minutes and I need to have this extra. So I
21 know how much it is pretty much monthly, but
22 that's about it.
23  Q.   How much is it usually monthly?
24  A.   About $142.
25  Q.   And do you know what, if anything,

Page 22

1 happens if you exceed your allotted minutes?
2   A.   You get -- I notice we were getting
3 text messages now or something that tells you
4 something, you know, you may -- because you
5 may -- you are close to exceeding your minutes
6 or something like that and if you want to, you
7 can expand your plan for additional $15 or
8 something like that.
9   Q.   And does your account with AT&T
10 provide text messaging? Do you have text
11 messaging available on both cell phone numbers?
12  A.   Yes.
13  Q.   And does it provide for data that you
14 can use the Internet without Wi-Fi?
15  A.   I think so, yes.
16  Q.   And to whom is the monthly statement
17 addressed by AT&T?
18  A.   To me.
19  Q.   And to which address is it sent?
20  A.   10 Mullen Drive.
21  Q.   Does Mr. Watkins's name appear
22 anywhere on the AT&T invoice?
23  A.   I don't believe so.
24  Q.   Okay. Do you know if Mr. Watkins
25 ever provided his cell phone number to

Page 23

1 Wachovia Bank?
2   A.   I don't think so. I don't know. I
3 have no idea.
4   Q.   When you say you don't think so, is
5 that based on something or --
6   A.   Yeah. Primarily, because, you know,
7 when you fill out those forms and all, you give
8 them your house number and all. So I'm going to
9 say, no, because there would be no need to give
10 a cell number.
11  Q.   Is that specific to Wachovia Bank or
12 just your general impression of filling out
13 forms?
14  A.   Well, I don't know. You're asking
15 Wachovia Bank. In all honesty, I don't -- in
16 all honesty, I don't know much about
17 Wachovia Bank. And then afterwards, I am
18 actually saying there's no real reason to give
19 your cell number because you're filling an
20 application with your house number. So the odds
21 of that, no, but I don't know specific about
22 with Wachovia Bank.
23  Q.   Okay. Are you aware that Mr. Watkins
24 had a credit card account that he initially
25 opened with Wachovia Bank --

Page 24

1   A.   No.
2   Q.   -- that was transferred to
3 Wells Fargo?
4   A.   I know about Wells Fargo, yeah.
5   Q.   Were you ever with Mr. Watkins at a
6 Wachovia Bank branch when he applied for a
7 credit card account?
8   A.   No.
9   Q.   Were you ever with Mr. Watkins when
10 he applied for any credit card account?
11  A.   I'm sure I may have been, yeah.
12  Q.   Anything specific that comes to mind?
13  A.   I think like a Lowe's, might have
14 been.
15  Q.   So when you were talking about why
16 would you put your -- any number other than your
17 home number down on an application, were you
18 thinking about the Lowe's application or were
19 you thinking about something else?
20  A.   I think I was just thinking about
21 applications in general, that there would be no
22 need to put your cell phone number down on an
23 application. And it's probably -- and to be
24 very honest with you, it's probably me thinking
25 that I don't do it. So that's what -- so to



PAULA WATKINS                                                              July 28, 2016
WATKINS vs WELLS FARGO BANK                                                      25–28

Page 25

1  answer your question, there's no reason to put
2  that down. So you got to give the house number.
3  So I'm sure he would be giving his house number
4  on an application and not specifically a
5  cell number.
6  Q.   Have you ever seen an application in
7  for a credit card account that requests your
8  home business and mobile/other phone numbers?
9  A.   I have not.
10 Q.   How many credit card applications
11 have you completed in the last five years?
12 A.   The last five years, I don't think I
13 completed a credit card application in the last
14 five years.
15 Q.   Do you remember what phone numbers
16 the Lowe's credit card application asked for?
17 A.   I don't.
18 Q.   Okay.
19 A.   I don't.
20 Q.   So is it fair to say that you don't
21 know one way or the other if Mr. Watkins
22 provided his cell phone number to Wachovia Bank?
23 A.   Now, are you -- no, I don't know
24 about a Wachovia. I'm familiar with, I think,
25 you said a Wells Fargo. I'm not familiar with

Page 26

1  Wachovia.
2  Q.   Okay. I will ask about Wells Fargo
3  next. I just want to cross it off.
4  A.   Okay.
5  Q.   So Wachovia is a no, you're not sure;
6  is that right?
7  A.   Doesn't sound familiar to me.
8  Q.   Do you know one way or the other if
9  Mr. Watkins ever provided his cell phone number
10 to Wells Fargo Bank?
11 A.   I don't know specifically, but I
12 don't think so.
13 Q.   And what leads you to say you don't
14 think so?
15 A.   For the same reason that I said,
16 that, you know, when you are filling out a
17 credit card application, there's no need to give
18 your cell number. There's no need for them to
19 call your cell number. You're filling out the
20 application so you would give your house number.
21 It's just something that, you know, I think we
22 typically do. I don't do it either.
23 Q.   When you say "we typically," are you
24 speaking about you --
25 A.   For any application, so if you are

Page 27

1  filling out -- and to answer your question, I
2  haven't filled out a lot because most people are
3  now behind the computer. So if you are looking
4  for any, you know, increase in your credit limit
5  or what have you, you don't fill out forms
6  anymore. You sit behind the computer. They ask
7  you questions and you answer them. They may not
8  ask you specific questions. So I don't see the
9  application. So I think that's what I'm
10 referring to, that, you know, you don't have --
11 someone is not asking you pointed questions
12 where you're not looking at an application
13 filling it out or signing anything too much
14 anymore. At least, I haven't.
15 Q.   And one other thing, I heard part of
16 the answer reference we don't do that.
17 A.   Uh-hum.
18 Q.   And are you speaking kind of
19 generically about yourself and Mr. Watkins or do
20 you have an articulated, understood policy of
21 not --
22 A.   We don't have an understood,
23 articulated policy.
24 Q.   All right. I just have to get out my
25 whole question.

Page 28

1  A.   I'm sorry.
2  Q.   But I just wanted to let you know.
3       So you don't have an articulated
4  policy of what, providing your cell phone number
5  or not providing your cell phone number?
6  A.   So Mr. Watkins and I don't have an
7  agreement that says, "Hey, when we're filling
8  out an application, we're not going to." So I'm
9  saying based upon our culture, our perspective
10 of completing applications, it is not something
11 that we would typically do. I don't think
12 about, oh, I'm going to make sure I give them my
13 cell phone number, so, no.
14 Q.   Is it your practice to like not
15 provide your cell phone number to people?
16 A.   It's not my practice, but I mostly
17 honestly somewhat -- yeah, I don't give it out.
18 I don't give it, my cell phone number. You ask
19 me my -- for information, unless you need to
20 contact me, I'm going to give you my home
21 number. So, no, it's not something I typically
22 do.
23 Q.   And how long have you had a
24 residential landline?
25 A.   We've had it since the house.



Page 29

1  Q.    Have you ever been with Mr. Watkins,
2  physically present, when Mr. Watkins was
3  speaking on the phone to Wells Fargo?
4  A.    I have.
5  Q.    Can you tell me about all of those
6  times that you can remember when Mr. Watkins was
7  speaking with Wells Fargo on the phone?
8  A.    I don't remember all the details. I
9  remember this one particular time simply because
10 he was frustrated, and we were about to sit down
11 and have dinner, and his phone rang and he
12 answered the phone, and he -- apparently, it was
13 Wells Fargo. So he was frustrated, and I said
14 to him, "Why are they calling you on your cell
15 phone? We are in the middle of dinner," because
16 telemarketers are annoying. For some reason,
17 they always find your -- they always call you
18 around dinnertime. So there's my reaction
19 again. I'm like why are they calling you on
20 your cell phone?
21       He said, "I don't know because I told
22 them not to call. I don't understand it." He
23 was pretty frustrated. It was frustrating.
24 Q.    When was that?
25 A.    It was a while ago. Yeah. It was a

Page 30

1  while ago, probably -- I don't know -- couple
2  years ago.
3  Q.    What is it about a phone call on a
4  cell phone that is making the event stand out in
5  your mind as opposed to someone ringing your
6  landline right before dinner?
7  A.    I think it's probably like you said.
8  I couldn't find the term. It's probably the
9  practice, and, I guess, he could probably tell
10 you best.
11       I am just not happy to answer the
12 telephone. I don't want to be bothered, period,
13 whether you are calling me at home, on my
14 landline or my cell phone, and that's the
15 absolute truth. So when I'm in the middle of
16 something and as far as I'm concerned, you are
17 either aggravating or annoying or you are not
18 going to say -- sometimes the telemarketers get
19 on the phone and there is a long pause, and they
20 catch you cooking. They catch you reading.
21 They catch you eating, and it is annoying. So I
22 don't even answer my cell phone that often.
23       So I would think that's probably my
24 feeling about it, and I think that's just -- so
25 if you're asking about the practice, that's why

Page 31

1  I use the term "culture." It's probably the
2  culture of my house, that that's kind of how we
3  feel.
4  Q.    And understanding that people use
5  their phones and electronics differently, that's
6  why I'm asking if there's something that strikes
7  a memory about a phone call on a cell phone
8  versus a phone call on a home phone?
9  A.    Probably because, to be honest with
10 you, I can peer at -- I'm usually at -- this is
11 Paula. I'm usually at the counter cooking, and
12 there is the phone, the landline. You can peak
13 at the landline and see who's calling, because
14 we have caller ID, and it is always a number
15 that looks like the numbers are all the same or
16 it is a number I don't recognize. So when I
17 peak it at it, it doesn't get answered, and I
18 say, "I don't know who that is," or if I decide
19 to, which is why I don't because it's always
20 somebody who is either annoying or they are --
21 you know, you get this whatever, this recording
22 or something that's going to come on 30 seconds
23 after you answer the phone. So that's probably
24 why, yeah.
25       And as far as my cell phone is

Page 32

1  concerned, you know, my cell phone -- I think
2  his -- it's somewhere else. You know, so it's
3  in my purse. I come home and I don't see it
4  again until I get ready to go to bed, possibly.
5  I'm like, oh, text messages, somebody texted me.
6  So some people, you are right, are on their
7  phone constantly and they live by it. I don't,
8  and so I think that's probably why I am so aware
9  of those calls.
10 Q.    And the telephone call that you were
11 just talking about where you are preparing
12 dinner and you remember Mr. Watkins speaking
13 with -- well, I'll backtrack.
14       Do you remember Mr. Watkins speaking
15 with someone from Wells Fargo during that phone
16 call?
17 A.    Whoever was on the phone, apparently,
18 was from Wells Fargo, and I think he was
19 frustrated. So, yes, because I asked him why
20 are they calling your cell phone?
21 Q.    And anything else you remember about
22 that conversation that you are overhearing?
23 A.    Just that he was angry, he was very
24 angry and frustrated about the call, and he
25 said, "I told you not to call me."



PAULA WATKINS  
WATKINS vs WELLS FARGO BANK  

July 28, 2016  
33–36  

Page 33

```
 1   Q.    Did you hear Mr. Watkins say, "I told
 2   you not to call me"?
 3   A.    Oh, yeah.
 4   Q.    Did you hear Mr. Watkins say anything
 5   else that you remember?
 6   A.    I can't, other than to tell me. He's
 7   like I don't understand it -- he was really
 8   frustrated -- why they call on your cell phone.
 9   I'm like why are they calling your cell phone?
10   Q.    Just to clarify, it sounds like that
11   response was something Mr. Watkins was saying to
12   you, like I -- am I right?
13   A.    No. He told whoever is on the
14   phone --
15   Q.    Okay.
16   A.    -- I told you not to call me.
17   Q.    Okay.
18   A.    And then I said. He said -- he went
19   on and I'm saying I asked him, you know, why are
20   they calling your cell phone?
21         He's like I don't know why they call
22   my cell phone. That was the conversation after
23   it, but he said, "I told you not to call me."
24   Q.    Okay. So the I don't know why they
25   call my cell phone was like Mr. Watkins and you
```

Page 34

```
 1   after he hung up --
 2   A.    Yes, that is correct.
 3   Q.    -- with Wells Fargo?
 4         This is just what I want to --
 5   A.    I'm sorry. Yes.
 6         That's our own conversation, because
 7   I would probably have asked him why are they
 8   calling your cell phone, because, as I said to
 9   you, it's annoying.
10   Q.    That's what I'm just trying to sort
11   of separate --
12   A.    Okay.
13   Q.    -- what happened when you were
14   listening and then after as --
15   A.    Okay.
16   Q.    -- what you two discussed.
17         So when you were overhearing
18   Mr. Watkins speak with a Wells Fargo
19   representative, it sounds like you said that you
20   heard him say "I told you not to call"; is that
21   right?
22   A.    Yes.
23   Q.    Anything else that you heard
24   Mr. Watkins say?
25   A.    I can't recall anything aside from
```

Page 35

```
 1   that, other than the conversation that we had
 2   afterwards about why they're calling on the
 3   cell phone.
 4   Q.    And you said that conversation was a
 5   couple of years ago?
 6   A.    It was, I think, a little bit ago.
 7   It was -- yeah, had to be a couple of years ago.
 8   I remember because, like I said, he was pissed
 9   off.
10   Q.    Okay.
11   A.    He was very upset.
12   Q.    And any other conversations that you
13   remember being present for with Mr. Watkins and
14   Wells Fargo?
15   A.    I don't know specifically. I can say
16   to you -- and, again, I probably should not say.
17   I have no dates, but I heard him say, "I told
18   you not to call me," and he's been on his cell
19   phone, but I can't tell you when, but I can tell
20   you that I heard him say, "I told you not to
21   call me on my cell phone."
22   Q.    Did he say, "I told you not to call
23   me," or, "I told you not to call me on my
24   cell phone"?
25   A.    I'm not sure, probably both.
```

Page 36

```
 1   Probably at some point, you know, both. I told
 2   you not to call me on my cell phone or I told
 3   you not to call me. I think it's probably my
 4   cell phone pretty much because he would have
 5   been picking up his cell phone at the time and
 6   not the house phone.
 7   Q.    Did Mr. Watkins want Wells Fargo to
 8   call on his house phone?
 9   A.    I don't know. I don't know if he
10   wanted them to call on his house phone. I just
11   know he didn't want them to call on his
12   cell phone.
13   Q.    Why?
14   A.    Again, it's annoying. I mean, we
15   don't, you know -- I mean, I don't know. I
16   can't speak for him. I'm sure you talked to
17   him. I'm just saying it's like probably the
18   culture of our house, and I'm kind of the one
19   that drives it.
20         There is a reason for -- no reason
21   for you to call me on my cell phone. My cell
22   phone is to be used the way I choose to use it
23   and if I have given you a number, that's what I
24   want you to use. That's what I want you to use.
25   It is kind of the culture in that way. So it's
```



### Page 37

1  not unusual for him or myself to say, "I told
2  you not to call me on my cell phone.
3      You know, when you get home from
4  work, and I think this is probably -- this is --
5  again, I can't speak for James, but I think it's
6  the culture of our house. I got -- you know, I
7  got a job that goes 24/7 and all if you wanted
8  it to be, and I look at my phone at night and
9  say, "Oh, somebody must have called me."
10  Because when I get home, I'm done. I don't want
11  to hear from you. Yeah, I don't. I'm just
12  being honest.
13      Q.   Have you ever been present where
14  Mr. Watkins was speaking with someone on your
15  landline, on your house phone, where he told the
16  caller I told you not to call me?
17      A.   I don't recall that, to be honest
18  with you. Uh-hum, no.
19      Q.   So it's only about phone calls on the
20  cell phone?
21      A.   I think so. That's what I tended to
22  hear, again, because, you know, it's in the
23  evening and, you know, if he gets any calls, it
24  might be on the cell phone. So I can't recall
25  hearing. I know specifically that cell phone

### Page 38

1  was, you know, an issue.
2      Q.   And have you ever been present when
3  Mr. Watkins received a call on his cell phone
4  from Bank of America?
5      A.   I can't recall specifically if he --
6  but I -- probably, yes, probably, and I think --
7  probably, yes, at some point, but I don't
8  recall.
9      Q.   Were you ever present when
10  Mr. Watkins told Bank of America representative
11  not to call him on his cell phone?
12      A.   I may have been. I can't recall, but
13  I may have been.
14      Q.   And when you said that you believe
15  you were present when Mr. Watkins told a
16  Wells Fargo representative I told you not to
17  call me or I told you not to call me on my
18  cell phone, how do you know it was a Wells Fargo
19  representative?
20      A.   I think it was his reaction to the
21  call, to be honest with you. That really
22  frustrated him. And, again, I don't know. I
23  wasn't on the call. So I don't know what the
24  person said. I don't know how they said it, but
25  he was very angry, and so that's how it stands

### Page 39

1  out to me.
2      Q.   Does being angry tie the phone call
3  to Wells Fargo?
4      A.   No. The being angry, just, you know,
5  the fact that as a result, I knew who it was.
6  So he said who it was, so I knew who it was.
7      I mean, you're asking me specifically
8  about Bank of America, and I'm actually sitting
9  here thinking I don't know. That one, I do
10  know. That's pretty specific.
11      So, again, I don't know how they
12  talked to him over the phone. I don't know if
13  they were inappropriate over the phone. I don't
14  know what happened, but I know that he was very
15  angry.
16      Q.   You, I think, testified that the
17  dinner making phone call, you knew that
18  Mr. Watkins was speaking with someone from
19  Wells Fargo because you specifically asked him?
20      A.   I did. I said to him, you know, "Who
21  is that and why are they calling your
22  cell phone?"
23      He said, "I don't know. I don't know
24  why they are calling my cell phone."
25      So, yes, we were having dinner, and

### Page 40

1  it's annoying. And I -- again, you know, it's
2  frustrating because he answers his phone more
3  than I do. If it's my call, I'm letting it
4  ring. So he picked up the phone, and I was
5  probably frustrated with him for doing it, and
6  we are in the middle of dinner and we had
7  probably just got started. So, yeah, I do
8  remember that.
9      Q.   So I understand about that
10  interaction, but for any other phone calls where
11  Mr. Watkins is telling someone on the other end
12  of the line I told you not to call me, how do
13  you know the person on the other end of the line
14  was from Wells Fargo?
15      A.   Oh, I didn't say that. I said --
16  what I -- you asked -- I said that I remember
17  specifically this particular time that stood out
18  at the -- when we were having dinner. Unless he
19  would have specifically said to me any other
20  time it's Wells Fargo, and so I can't recall any
21  specifics about Wells Fargo.
22      I think you asked me about Bank of
23  America at one point, and I said to you I may
24  have, but -- and I'm saying this in the context
25  of, again, the culture of my house.



PAULA WATKINS
WATKINS vs WELLS FARGO BANK

July 28, 2016
41–44

Page 41

1  You know, Mr. Watkins gets home
2  before I do. So I don't -- necessarily am
3  around him when he gets calls. But when I come
4  home from work, I fix dinner and I have a
5  schedule and I want to sit down. I don't want
6  interruption. So, in all honesty, I'm probably
7  more pissed off than he is. So I don't want to
8  be bothered. So that's why specifically I asked
9  the question, and he tells me I ask too many,
10  but I asked the question and I want to know who
11  is that? It's dinnertime, you know, and I can't
12  believe he's even answering the phone. So as a
13  result, he answered the phone. He told me, and
14  I was probably -- I was a little irritated too,
15  but he was more irritated. He was very angry.
16      Again, I don't know if the person was
17  inappropriate or how they talked to him, because
18  sometimes people who are talking to you over the
19  telephone, even though they are calling you,
20  telemarketers, they are sometimes highly
21  inappropriate. So I'm making the assumption
22  that could be why he was, you know, angry too.
23  I don't know.
24  Q.  Were there any other conversations
25  that you were a witness to between Mr. Watkins

Page 42

1  and Wells Fargo?
2  A.  I can't specifically say that I --
3  that any specific times or I specifically heard
4  him say anything to Wells Fargo specifically,
5  you know. I probably -- I don't. The answer is
6  no. I'm not going to say. I can't say honestly
7  that I have.
8  Q.  Okay. And do you have any notes or
9  e-mails or letters or doodles about Mr. Watkins
10  asking Wells Fargo to stop calling his
11  cell phone?
12  A.  Do I have any notes?
13  Q.  Uh-hum.
14  A.  No.
15  Q.  Have you ever contacted AT&T to block
16  Wells Fargo's number from Mr. Watkins'
17  cell phone?
18  A.  No.
19  Q.  You're not a plaintiff in this
20  lawsuit; is that right? You're not one of the
21  people suing Wells Fargo; is that right?
22  A.  That's correct.
23  Q.  Have you written anything like online
24  or in Twitter, Facebook or a blog about this
25  lawsuit?

Page 43

1  A.  Oh, no.
2  Q.  Have you given any statements to any
3  reporters about this lawsuit?
4  A.  No.
5  Q.  Okay. Have you ever been represented
6  by the Flitter and Lorenz firm, you personally?
7  A.  Oh, no.
8      MR. MILZ: Let me just interject.
9      Do you recall the engagement letter?
10      THE WITNESS: The thing I had to
11  sign?
12      MR. MILZ: Yes.
13      THE WITNESS: Okay.
14      MR. MILZ: She has retained my firm,
15  yes.
16      MS. LAVERY: Okay. Is that something
17  recent?
18      MR. MILZ: Yes.
19      THE WITNESS: Yeah. That would have
20  been recent. I'm sorry. I didn't understand
21  the language. I apologize. I don't know how to
22  thank you because...
23  BY MS. LAVERY:
24  Q.  Have you ever hired Mr. Milz's firm
25  before?

Page 44

1  A.  Before?
2  Q.  Well, ever. Have you ever hired
3  Mr. Milz's firm --
4  A.  Have I ever hired them?
5  Q.  Yes.
6  A.  I have not personally hired them, but
7  I'm signing a document that he's referring to
8  that -- yes, that says -- see, it is on my
9  cell phone. That's what I'm saying. I
10  haven't -- you know, I haven't even had a chance
11  to really look at it, but, yes, I signed a
12  document saying that he's, I think, representing
13  me.
14      THE WITNESS: Right? Yeah.
15      MR. MILZ: Yes.
16      MS. LAVERY: Sorry. Part of that
17  answer, did it say I haven't hired him
18  personally?
19      (Whereupon, reporter read back
20  preceding answer.)
21  BY MS. LAVERY:
22  Q.  When you said "I haven't hired him
23  personally," have you hired Mr. Milz's firm for
24  someone else?
25  A.  No. I misunderstood your question.



800.211.DEPO (3376)
EsquireSolutions.com

PAULA WATKINS  July 28, 2016
WATKINS vs WELLS FARGO BANK  45–48

Page 45

1  Because your question was have I hired -- have I
2  hired him, and the answer was -- because I'm
3  referring to this --
4  Q.   Yes.
5  A.   -- and I know that this lawsuit and
6  the situation is between my husband and I.
7       So that's where I misunderstood.
8  Q.   Okay.
9  A.   So the answer to your question is,
10 yes, right. And so based on -- and I have to
11 listen to your question because I don't think it
12 was clear to me. I apologize.
13 Q.   Yeah. No.
14 A.   I should have asked you to be clear.
15 Q.   I probably was unclear.
16 A.   Yeah.
17 Q.   Circular thing.
18 A.   Okay.
19 Q.   All right. So if I understand,
20 you've hired Mr. Milz's firm separate and apart
21 from this lawsuit --
22 A.   Yes.
23 Q.   -- Watkins versus Wells Fargo?
24 A.   Yes.
25 Q.   Okay. And does that retention have

Page 46

1  anything to do with Wells Fargo?
2  A.   I don't believe so, yeah.
3  Q.   Have you told me about all of the
4  conversations that you can recall where
5  Mr. Watkins received a phone call from
6  Wells Fargo on his cell phone?
7  A.   I have, yes. That's -- I don't
8  recall specifically other calls.
9  Q.   Just that one, the dinner call?
10 A.   Yeah.
11 Q.   Okay.
12 A.   Uh-hum.
13 Q.   And as you sit here today, there's no
14 other phone call that you remember being present
15 for made by Wells Fargo to Mr. Watkins on his
16 cell phone; is that right?
17      MR. MILZ: I'll object to the
18 characterization of the witness's testimony.
19      MS. LAVERY: I am not characterizing.
20 I'm just trying to be clear because I know that
21 I've probably asked unclear questions. So I'm
22 trying to go back and be like focused, so I can
23 re-ask.
24 BY MS. LAVERY:
25 Q.   Basically, I've heard the one

Page 47

1  conversation you were present for when you were
2  making the dinner --
3  A.   Uh-hum.
4  Q.   -- between Mr. Watkins and
5  Wells Fargo.
6       I'm asking if there are any other
7  conversations that you remember being present
8  for between Mr. Watkins and Wells Fargo?
9  A.   I can't remember. I cannot answer
10 your question in the affirmative because I
11 cannot remember.
12 Q.   Okay.
13 A.   Yeah, I can't.
14 Q.   So there may have been more or maybe
15 not?
16 A.   Uh-hum.
17 Q.   "Yes" or "no"?
18 A.   There may have been more.
19 Q.   Okay.
20 A.   There may have been more.
21 Q.   Okay. But as you sit here today, you
22 don't -- you can't recall those?
23 A.   I can't recall those. That's
24 correct.
25 Q.   Is there anything that you could look

Page 48

1  at that would help you recall any other
2  conversations that you were present for between
3  Mr. Watkins and Wells Fargo?
4  A.   I can't say honestly, though, I
5  could.
6  Q.   Notes, e-mails, dates on a calendar?
7  A.   I don't believe so.
8  Q.   Okay.
9  A.   Yeah.
10 Q.   Have you ever heard Mr. Watkins tell
11 someone that called on his cell phone to call
12 his home line instead?
13 A.   I can't recall. You know, I can't
14 recall.
15      MS. LAVERY: Sorry. I'm just looking
16 at this to try and speed this along.
17 BY MS. LAVERY:
18 Q.   Did you have to pay any extra fees or
19 overage charges for any of the phone calls
20 Wells Fargo made to Mr. Watkins number?
21 A.   I don't know.
22 Q.   Where would you look to see if you
23 had paid any late fees or overages?
24 A.   If I were looking, I'd probably look
25 on the cell phone bill if I were looking.



Page 49

1  Q.  Do you know if all of the Wells Fargo
2  calls made to Mr. Watkins' cell phone came up
3  with the same number on the caller ID?
4  A.  Can you repeat? I'm sorry.
5  Q.  Do you know if Wells Fargo's phone
6  calls to Mr. Watkins like identified themselves
7  on the cell phone's caller ID?
8  A.  I don't recall. Uh-huh. I have no
9  idea.
10 Q.  Has your cell phone service ever been
11 shut off on this AT&T account?
12 A.  Uh-hum.
13 Q.  "Yes" or "no"?
14 A.  I'm sorry. No.
15 Q.  And did you ever have any
16 communications with Wells Fargo about
17 Mr. Watkins' credit card account?
18 A.  Never.
19 Q.  Okay. So have you ever called
20 Wells Fargo to make a payment by phone on
21 Mr. Watkins' credit card account?
22 A.  No.
23 Q.  Were you an authorized user on
24 Mr. Watkins' credit card account?
25 A.  I don't know.

Page 50

1  Q.  Do you remember ever using --
2  A.  No, I've never used it.
3       MS. LAVERY: I will just look through
4  this one more time.
5  BY MS. LAVERY:
6  Q.  What did you do to prepare for the
7  deposition today?
8  A.  What did I do to prepare?
9  Q.  Uh-hum.
10 A.  I made sure that I was here by one.
11 Q.  What else?
12      MR. MILZ: I'll just object and
13 remind you, Paula, that any conversations
14 between you and me are attorney-client
15 privileged. Any conversations between you and
16 James are privileged as well. So with that in
17 mind, you can answer.
18      MS. LAVERY: I don't know if that's
19 entirely true because she's not the client here.
20      MR. MILZ: Well, there's spousal
21 privilege.
22      MS. LAVERY: But that's breached when
23 you are there.
24      MR. MILZ: I wasn't there.
25      MS. LAVERY: If it's a three-way

Page 51

1  FaceTime call.
2       I won't make --
3       MR. MILZ: With both my clients?
4       MS. LAVERY: She's not in this case.
5       MR. MILZ: She is.
6       MS. LAVERY: She's not a party.
7       MR. MILZ: She's not a party, but she
8  is represented by our firm to represent her in
9  this case, in this deposition.
10      MS. LAVERY: I would probably
11 disagree. It won't be an issue because I won't
12 push this, but --
13      MR. MILZ: You can answer. With that
14 objection noted, you can answer.
15 MS. LAVERY:
16 Q.  Typically, people are instructed not
17 to answer -- no, not -- you answer, but you
18 don't say, "My attorney told me blah, blah," you
19 know. You can say, "I spoke with my attorney,"
20 but you don't say what each other said. So
21 that's what your attorney is reminding you about
22 my question. So I'll start over now that we are
23 on the same page.
24      What did you do to prepare for
25 today's deposition?

Page 52

1  A.  I've spoken to my attorney, and I got
2  here. I made sure I was here before one.
3  Q.  And when did you speak with your
4  attorney?
5  A.  It was yesterday, yesterday.
6  Q.  And is the attorney you are speaking
7  about -- referencing Andy Milz --
8  A.  Yes.
9  Q.  -- who is here today?
10 A.  Yes.
11 Q.  And how did you speak with him, on
12 the phone, on FaceTime?
13 A.  I think it's considered FaceTime.
14      MR. MILZ: Uh-hum.
15 MS. LAVERY:
16 Q.  Was anyone else on the call?
17 A.  Not at the time -- well, my husband.
18 Q.  So there was a FaceTime call with
19 Mr. Milz yesterday?
20 A.  Yes.
21 Q.  And how long was that call?
22 A.  I don't know because I was only there
23 for part of it. So I don't know how long they
24 were on the phone. But for me, it wasn't -- I
25 don't know -- a couple minutes.



Page 61

```
 1                    C E R T I F I C A T E
 2
 3              I, LISA ANNA RINALDI, RPR, and a
 4      Certified Court Reporter and Notary Public of the
 5      State of New Jersey, do hereby certify that prior
 6      to the commencement of the examination, the
 7      witness was duly sworn by me to testify the
 8      truth, the whole truth and nothing but the truth.
 9              I DO FURTHER CERTIFY that the
10      foregoing is a true and accurate transcript of
11      the testimony as taken stenographically by and
12      before me at the time, place and on the date
13      hereinbefore set forth, to the best of my
14      ability.
15              I DO FURTHER CERTIFY that I am
16      neither of counsel nor attorney for any party in
17      this action, and that I am not interested in the
18      event nor outcome of this litigation.
19
20      [signature: Lisa Anna Rinaldi]
21
22      LISA ANNA RINALDI, C.C.R., R.P.R.
        LICENSE NO. XI00226000
23      Notary Public of the State of New Jersey
24      8/8/2016
25
```

